IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| SANDRA SMEE,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,<br><br>Defendant. | CASE NO. 1:26-cv-0033<br><br>DISTRICT JUDGE DONALD C. NUGENT<br><br>MAGISTRATE JUDGE JAMES E. GRIMES JR.<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Sandra Smee filed a complaint against the Commissioner of Social Security Administration seeking judicial review of the Commissioner's decision denying her application for disability insurance benefits. Doc. 1. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. For the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural background**

In October 2023, Smee applied for disability insurance benefits.[1] Tr. 233. In her application, Smee claimed that she was disabled and limited in her ability to work due to hernia, nausea, and gastrointestinal problems such as

[1] Smee initially filled out her application in September 2023, *see* Tr. 123, 124, but did not file it until October 2023, Tr. 233. *See* C.F.R. 20 § 404.614 (stating that an application for disability insurance benefits is deemed filed "on the day it is received" by a Social Security Administration employee).

diverticulitis.[2] Tr. 312. Smee initially alleged a disability onset date of February 1, 2023,[3] Tr. 312, but later amended it to June 30, 2023, Tr. 10, 387. The Commissioner denied Smee's application initially and on reconsideration, Tr. 86, 95, and Smee requested a hearing before an administrative law judge (ALJ). Tr. 148–49.

In February 2025, Smee appeared and testified at a telephonic hearing before an ALJ. *See* Tr. 97–108. Smee was represented by counsel. Tr. 93. Qualified vocational expert William Cody also testified at the hearing. Tr. 109–16. The following month, the ALJ issued a written decision finding that Smee was not entitled to benefits. *See* Tr. 10–30. The Appeals Council declined further review, making the ALJ's decision final. Tr. 1; *see* 20 C.F.R. § 404.981.

Smee timely filed this action in January 2026. Doc. 1. In it, she presents the following issue for review:

> Whether the [ALJ]'s findings and conclusions concerning the Plaintiff's residual functional capacity are supported by substantial evidence.[4]

---

[2] Diverticulitis is "inflammation of a diverticulum, especially inflammation related to colonic diverticula, which may undergo perforation with abscess formation." Dorland's Illustrated Medical Dictionary, at 552 (33d. ed. 2020). It is also called "left-sided appendicitis." *Id.*

[3] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 22, 425 (6th Cir. 2006).

[4] A residual functional capacity (RFC) is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and

Doc. 7, at 1.

**Evidence**[5]

*Personal and Vocational Evidence*

Born in 1971, Smee was 52 years of age on the alleged disability onset date. *See, e.g.*, Tr. 111, 123, 308. She earned a GED. Tr. 313. Smee worked as an assembler from 2020 to 2023. Tr. 313.

*Medical Evidence*[6]

Smee had a history of diarrhea and abdominal pain dating to 2021, Tr. 728, 1042. In August 2023, Smee underwent an Upper GI examination,[7] which

---

cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

5 The recitation of evidence is not intended to be exhaustive and is generally limited to the evidence cited in the parties' briefs and relevant to their arguments.

6 In this case, Smee only challenges the ALJ's findings regarding her physical limitations. *See* Doc. 7, at 2–3; *see also* Doc. 9, at 2 n.1. Accordingly, the Court summarizes and discusses evidence only with regards to Smee's physical health. *See Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006) ("[W]e limit our consideration to the particular points that [the claimant] appears to raise in her brief on appeal.").

7 An upper GI examination is a "fluoroscopic and radiographic examination (as for the detection of gastroesophageal reflux, hiatal hernia, or ulcers) of the esophagus, stomach, and duodenum during and following oral ingestion of a solution of barium sulfate." *See* Upper GI series, Merriam-Webster.com Medical Dictionary, Merriam-Webster, https://www.merriam-webster.com/medical/upper%20GI%20series (last visited August 11, 2026); *Voage v. Shpaner*, 3:31-cv-00420, 2021 WL 5417147, at *1 n.1 (S.D. Cal. Nov. 19, 2021).

showed symptoms of gastroesophageal reflux disease.[8] Tr. 577. A CT scan of her abdomen and pelvis also revealed signs of acute diverticulitis and a tiny hernia. Tr. 586.

Smee underwent hernia surgery in October 2023. Tr. 469. When Michaela Donca, M.D., evaluated Smee days before the surgery, Smee was "overall … feeling well" but complained of heartburn, abdominal pain, and diarrhea. Tr. 488. Smee denied having constipation, nausea, or dizziness, and her abdomen was soft. Tr. 489. Smee's motor function and coordination were also intact. Tr. 490. Dr. Donca diagnosed Smee with GERD with esophagitis without hemorrhage. Tr. 490. Smee returned home a day after the surgery. Tr. 463, 477.

For the next few weeks, Smee was "doing well" with her diet, which initially consisted of liquids and protein shakes. Tr. 458–59, 461. Although Smee experienced "a squeezing above her umbilicus," she managed her pain with Tylenol during the day and oxycodone at night. Tr. 462. She also walked her dog "every 2 hours." Tr. 462. By early November 2023, however, Smee's pain intensified after Smee picked up her 150-pound dog. Tr. 459. Smee also reported daily diarrhea and difficulty consuming pureed foods—such as Greek

---

8 "Gastroesophageal reflux disease (GERD) occurs when stomach acid frequently flows back into the tube connecting your mouth and stomach (esophagus). This backwash (acid reflux) can irritate the lining of your esophagus." *See Gastroesophageal reflux disease (GERD)*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/gerd/symptoms-causes/syc-20361940 (last visited August 11, 2026); *Clevenger v. Centurion*, 1:20-cv-230, 2021 WL 6051080, at *2 n.1 (E.D. Tenn. Dec. 21, 2021).

yogurt, cottage cheese, and pudding—stating that she vomited at least once or twice per day. Tr. 458. Smee explained that the vomiting occurred when she had three or four bites of food before drinking. Tr. 456. Smee further noted that "[a]ll of these food items add[ed] uncomfortable pressure" and would "feel stuck or come up." Tr. 458. Still, Smee had "no problems with fluids," Tr. 458, and walked "all the time," Tr. 456.

Smee reported "feeling better" later in November after she stopped drinking liquids with her pureed meals. Tr. 455. Aside from intermittent diarrhea, Smee expressed that her issues had been "resolved." Tr. 455. Smee was able to consume fluids, protein shakes, couscous, and cereal without any issues. Tr. 455. Still, Smee continued to experience occasional nausea and "vomited twice over the past [two] weeks." Tr. 455. Smee could not try solid foods because "she [was] scared." Tr. 455. She also began experiencing dizziness. Tr. 455.

In December 2023, Dr. Donca followed up with Smee, who again reported dysphagia,[9] nausea after eating, and vomiting after drinking water or protein shakes. Tr. 450; *see* Tr. 1059–68. Smee also reported feeling coldness in her extremities and dizziness "like the room [was] spinning." Tr. 450. Yet Smee denied any abdominal pain, constipation, or diarrhea. Tr. 1060. She also exhibited normal gait, grip strength, range of motion, and reflexes. Tr. 1061. A

---

[9] Dysphagia refers to "difficulty in swallowing." Dorland's Illustrated Medical Dictionary, at 573 (33d. ed. 2020).

modified barium-swallow study revealed no "pharyngeal [or] esphageal deficits." Tr. 449. Dr. Donca referred Smee to physical therapy for vertigo, Tr. 450–51, 1061, but the record does not contain evidence that Smee completed physical therapy.

In January 2024, Dorothy Bradford, M.D., examined Smee and concluded that Smee's hernia surgery "caused dysphagia, nausea, and vomiting." Tr. 421. Dr. Bradford also diagnosed Smee with "GERD, hypothyroidism, and mild intermittent asthma." Tr. 421. Even so, Dr. Bradford observed that Smee was not in acute distress, found no gastrointestinal or musculoskeletal issues, and recommended no activity restrictions. Tr. 421. The following month, Smee no longer experienced vomiting, chest discomfort, or reflux, but she continued to have swallowing difficulties and a sensation that "something [was] stuck in her throat." Tr. 435. Smee underwent a laryngoscopy, which revealed no abnormalities other than a "mild" tension in laryngeal muscle. Tr. 1049, 1054. Smee's esophagram result was also overall "unremarkable" except for a "mild delay in transit of [a food item] in the distal esophagus which clears following administration of water." Tr. 542–43.

In June 2024, Smee reported having diarrhea several times per day. Tr. 1171. She also experienced dysphagia and vomiting when eating. Tr. 1171. Although Smee was able to drink protein shakes, she still felt "liquids stuck in her throat" and "ha[d] to concentrate to swallow." Tr. 1171. Smee said that because she woke up choking, she slept "upright in [a] recliner" rather than in

bed. Tr. 1171. Smee, however, had no abdominal pain, constipation, nausea, or dizziness. Tr. 1171. A CT scan of her abdomen and pelvis was unremarkable except for a kidney stone and a fatty liver. Tr. 1148; *see* Tr. 1183–86. A barium-swallow study suggested that food that remained in Smee's esophagus cleared better "with increased bolus size and a liquid chaser." Tr. 1187–98.

In October 2024, Smee had surgery to dilate her esophagus. *See* Tr. 1141–46. Even after the surgery, Smee continued to report a "sticking sensation in her throat and chest." Tr. 1274. Although Smee's esophagus initially appeared normal, Tr. 1375, a subsequent esophageal manometry indicated ineffective esophageal motility,[10] "with only 40% of the swallows being completely normal." Tr. 470, 1399. There was no evidence of hernia. Tr. 1438. After discussing the matter with Aviv Ben-Meir, M.D., Smee opted against additional procedures due to the risk of increased reflux, informing Dr. Ben-Meir that she "prefer[red] her current symptoms to reflux." Tr. 1381.

*Hearing Testimony*

Smee, who was represented by counsel, testified at the January 2025 administrative hearing. Tr. 97–108. Smee stated that she stopped working in June 2023 because she "was in the bathroom several times a day … due to diarrhea or vomiting," Tr. 99, and routinely missed one or two days of work per week "due to [her] morning routine with [her] stomach," Tr. 100. Smee testified

---

10 Motility means "spontaneous movement" or "the ability to move spontaneously." Dorland's Illustrated Medical Dictionary, at 1165 (33d. ed. 2020).

that she used the bathroom at least twice daily, with each visit lasting "15 minutes to 45 minutes." Tr. 100.

Smee testified that her condition had since "gotten worse." Tr. 100. Unable to keep food down, Smee experienced "major weight loss," Tr. 99, and drank two or three protein shakes daily "to b[e] able to function." Tr. 102. Besides protein shakes, her food intake was mostly limited to "very small portions" of soft foods and ground turkey, Tr. 100, 102, as other foods would get "stuck in [her] throat" and cause her to vomit. Tr. 100. Further, according to Smee, "[a]nything that goes in … [would] come[ ] out within 45 minutes to an hour." Tr. 102.

Smee also reported "severe stomach pain and chest pain," Tr. 99. The pain occurred "[t]hree times a day" or whenever Smee ate or used the bathroom. Tr. 101. Smee described the pain as feeling "like someone is punching you in the stomach or someone is sitting on your chest." Tr. 101. To alleviate the pain, Smee applied "[a] heating pad" on her muscles throughout the day and night. Tr. 101. Even so, about twice a week, Smee could hardly get out of bed or leave her bathroom because of the pain. Tr. 103. Smee said that she would refrain from eating or drinking altogether to avoid those "bad days," especially before her medical appointments. Tr. 103–04.

Qualified vocational expert, William Cody, also testified. Tr. 109–16. The ALJ asked Cody whether a hypothetical individual with Smee's age, education, and work history could perform any work in the national economy

if the individual had the following limitations: "at the light exertional level … simple tasks, occasional interaction with others in a work environment with only occasional changes and no production line work." Tr. 111. Cody answered that the hypothetical individual would be able to work as a routing clerk, press operator, or cleaner or housekeeper, adding that all these positions have bathrooms on the premises. Tr. 111. Cody explained that the hypothetical individual could perform the same jobs at the medium exertional level, as well. Tr. 112.

Smee's counsel then asked whether there would be any jobs available if the same individual needed to take an unscheduled break for 15 to 45 minutes each day. Tr. 112. Cody testified that taking an unscheduled break of that duration on a consistent basis would be work-preclusive. Tr. 112. Cody further stated that arriving an hour or more late once per week would be work-preclusive, explaining that employers treat that level of tardiness as an absence and tolerate no more than one absence per month. Tr. 113. Finally, Cody stated that being off-task 15 percent or more of a workday on a routine basis would likewise preclude all employment. Tr. 113.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2028.

2. The claimant has not engaged in substantial gainful activity since June 30, 2023, the amended alleged onset date (20 CFR 404.1571 *et seq*.).

3. The claimant has the following severe impairments: borderline personality disorder, generalized anxiety disorder (GAD), post-traumatic stress disorder (PTSD), major depressive disorder (MDD), hiatal hernia status-post repair, dysphagia to solids, diverticulitis, and gastroesophageal reflux disease (GERD) with esophagitis without hemorrhage (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except: She can perform simple tasks with occasional interaction with others in a work environment where there are no more than occasional changes. She cannot perform production line work.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant … was 52 years old, which is defined as an individual closely approaching

advanced age, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number sin the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 30, 2023, through the date of this decision (20 CFR 404.1520(g)).

Tr. 12–30.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id.* "The

claimant, however, retains the burden of proving her lack of residual functional capacity." *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of Review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

*1. The ALJ Appropriately Applied SSR 16-3 in Evaluating Smee's Subjective Symptoms.*

Smee first challenges the ALJ's RFC findings by asserting that her medical conditions could "reasonably be expected to produce the symptoms alleged" and that she could not maintain employment "due to the extent of her symptoms." Doc. 7, at 9.

Social Security Ruling (SSR) 16-3p governs the ALJ's assessment of symptoms, which was formerly referred to as a "credibility" determination in SSR 96-7p.[11] Under SSR 16-3p, an ALJ undertakes a two-step process to assess

---

11 In relevant parts, SSR 16-3p removed the word "credibility" from its predecessor and refocused the ALJ's attention on the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *2 (SSA Oct. 25, 2017). Despite these changes, the procedures for reviewing an ALJ's assessment under SSR 16-3p are substantially the same as the procedures under SSR 96-7p. *See Delong v. Comm'r of Soc. Sec.*, No. 2:18-cv-368, 2019 WL 409364, *7–8 (S.D. Ohio, Feb. 1, 2019). Courts agree that the prior case law involving SSR 96-7p generally applies to the renamed "consistency determination" under SSR 16-3p. *Whicker-Smith v. Comm'r of Soc. Sec.*, No. 1:18-cv-52, 2019 WL 911084, at *5 (S.D. Ohio, Feb. 25, 2019), *report and recommendation adopted*, 2019 WL 1202361 (S.D. Ohio Mar. 14, 2019).

the limiting effects of a claimant's symptoms. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304. At step one, "the ALJ will ask whether … there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)); SSR 16-3p, 2017 WL 5180304, at *3. At step two, "if … such an impairment exists," the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities." *Rogers*, 486 F.3d at 247; Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4.

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," an ALJ considers medical evidence, the claimant's statements, other information provided by medical sources, and any other relevant evidence in the record. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4; 20 C.F.R. § 404.1529(c)(4). Aside from medical evidence, SSR 16-3p requires the ALJ to consider: daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve pain; any measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain or other symptoms." 2017 WL 5180304, at *4; 20 C.F.R. § 404.1529(c)(3). To be sure, "[t]he ALJ need not analyze all seven factors, but should show that he considered the relevant evidence." *Hatcher v. Berryhill*, No. 1:18-cv-1123,

2019 WL 1382288, at *15 (N.D. Ohio Mar. 27, 2019) (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005)).

The ALJ here properly followed SSR 16-3p in evaluating Smee's subjective symptom complaints. At step one, the ALJ found that Smee had "impairments that [could] be expected to produce some discomfort and functional limitations." Tr. 18. Moving to step two, the ALJ found that "the objective evidence does not support [Smee's] contentions regarding the severity, chronicity and/or frequency of [the] symptoms." Tr. 18. Although Smee dismisses the ALJ's findings as "boilerplate language," Doc. 7, at 10, she overlooks the ALJ's thorough discussion of the supporting evidence in the record. For example, the ALJ reviewed Smee's function report, Tr. 335–41, and found that Smee could prepare meals, do laundry, perform household chores, wash dishes, mob floors, as well as drive and shop for her needs, Tr. 17; *see* 20 C.F.R. § 404.1529(c)(3)(i) (requiring ALJs to consider the claimant's daily activities in evaluating subjective symptoms). As the Sixth Circuit has recognized, it is reasonable for an ALJ to rely on a claimant's ability to perform "activities of daily living, such as driving, shopping, fixing meals, [and] doing small loads of laundry, … in concluding that [that claimant] was not as limited as she had claimed." *Knapp v. Comm'r of Soc. Sec.*, No. 22-2055, 2023 WL 6800153, at *3 (6th Cir. Oct. 16, 2023) (per curiam).

The ALJ also went far beyond just relying on "minor, life-sustaining activities" to conclude that Smee's symptoms were not disabling. *Lawrence v.*

*Comm'r of Soc. Sec.*, 1:21-cv-1691, 2023 WL 2246705, at *12 (N.D. Ohio Jan. 19, 2023). The ALJ considered "[t]he location, duration, frequency, and intensity" of Smee's symptoms, 20 C.F.R. § 404.1529(c)(3)(ii), noting that Smee felt "like someone [was] punching [her] stomach or … sitting on [her] chest" each time she ate," Tr. 18. The ALJ further noted that Smee's symptoms had "gotten worse" following her October 2023 hernia surgery, Tr. 17; *see also* 20 C.F.R. § 404.1529(c)(3)(iii) (requiring the ALJ to consider "[p]recipitating and aggravating factors" for the claimant's pain). Moreover, the ALJ expressly discussed various measures that Smee took to address her pain and dysphagia, including over-the-counter medications, Tr. 19, dietary regimens, Tr. 19–20, diagnostic evaluations, Tr. 20–22, and esophageal dilation surgery, Tr. 23. *See* 20 C.F.R. § 404.1529(c)(3)(iv)–(v) (instructing ALJs to consider types of medications and treatments used to alleviate a claimant's symptoms).

Nor did the ALJ impermissibly ignore medical evidence regarding Smee's symptoms, such as vomiting and swallowing difficulties. To the contrary, the ALJ repeatedly recognized Smee's dysphagia and ineffective motility diagnoses, *see* Tr. 23–24, but he then noted that Smee's medical providers found no acute distress or remarkable abnormalities overall, *see* Tr. 21–22. The ALJ also cited Dr. Ben-Meir's notes that Smee declined more aggressive intervention for her dysphagia and "prefer[red] her current symptoms" to the potential risk of increased reflux. Tr. 1381; *see also Branon v. Comm'r of Soc. Sec.*, 539 F. App'x 675, 678 (6th Cir. 2013) (finding no

disability in a case where a claimant declined more aggressive treatment, reasoning that the claimant's choice of a "conservative treatment approach suggest[ed] the absence of a disabling condition").

Similarly, even though the ALJ's decision did not catalogue every medical note referencing Smee's diarrhea, the ALJ reviewed and considered evidence that Smee had a history of abdominal pain and diarrhea while she was still working. *See* Tr. 728, 1042. "[T]he law does not require the ALJ to discuss every piece of evidence that is supportive or inconsistent with the RFC." *See Byler v. Kijakazi*, No. 5:20-cv-1822, 2022 WL 980099, at *9 (N.D. Ohio Jan. 21, 2022), *report and recommendation adopted*, 2022 WL 971384 (N.D. Ohio Mar. 31, 2022); *see also Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (explaining that "[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party."). In sum, substantial evidence supports the ALJ's evaluation of Smee's symptoms, and the ALJ gave sufficient explanation to make clear the weight he gave to relevant evidence and the reasons for that weight. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *10.

Smee emphasizes consistencies between her subjective complaints and other evidence, arguing that the evidence "corroborate[s] her subjective allegations and do[es] not detract from them." Tr. 7, at 11. But the question before this Court is not whether the record contains evidence to support Smee's preferred findings. "The decision of an ALJ is not subject to reversal, even if

there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). In so far as Smee invites the Court to reweigh the evidence and substitute its own judgment for that of the ALJ, the Court should decline the invitation. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x. 411, 414 (6th Cir. 2011). In any event, evidence that Smee experienced limitations or required accommodations does not necessarily establish that she was as limited as she alleged; it simply demonstrates that Smee remained capable of performing work consistent with the assigned RFC. *See Rottman v. Comm'r of Soc. Sec.*, 817 F. App'x 192, 195 (6th Cir. 2020) (affirming an ALJ's ruling that a claimant's activity was inconsistent with alleged symptoms, even though the claimant needed accommodations for the activity).

*2. The ALJ Properly Considered the Full Extent of Smee's Limitations in Formulating the RFC.*

Smee alternatively contends that the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to account for the "full extent" of Smee's alleged limitations, especially the need for frequent bathroom breaks and absences. Doc. 7, at 9. In Smee's view, the ALJ should have included these limitations in the RFC because Cody offered vocational expert testimony regarding the work-preclusive nature of taking breaks and absences on a routine basis. Doc. 7, at 10; Tr. 112–13.

The Court disagrees. To be sure, "for a vocational expert's testimony in response to [an ALJ's] hypothetical question to serve as substantial evidence … the question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). "Hypothetical questions, however, need only incorporate those limitations which the ALJ has accepted as credible." *Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 865 (6th Cir. 2011). Likewise, "the ALJ need not identify the claimant's precise limitations before posing hypothetical questions to the vocational expert." *Kessans v. Comm'r of Soc. Sec.*, 768 F. App'x 531, 536 (6th Cir. 2019); *Knott v. Comm'r of Soc. Sec.*, No. 5:18-cv-1226, 2019 WL 4143885, at *15 (N.D. Ohio June 2019), *report and recommendation adopted*, 2019 WL 4142596 (N.D. Ohio Aug. 30, 2019). Indeed, "the ALJ may pose a question involving a hypothetical individual with several limitations—and then later decide that those limitations differed from the claimant's limitations." *Kessans*, 768 F. App'x at 536. "[T]o hold otherwise would effectively eliminate the ALJ's ability to ask any questions about a hypothetical individual unless he had identified the exact contours of the claimant's disability by the time of the hearing." *Id.*; *Knott*, 2019 WL 4143885, at *15.

Applied here, the ALJ's RFC findings are not required to reflect Smee's alleged need for breaks and absences merely because the ALJ asked Cody about it. *See Kessans*, 768 F. App'x at 536; *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (explaining that an ALJ's hypothetical

question to a vocational expert need only include the limitations that the ALJ assessed in the RFC, along with the claimant's age, education, and work experience). To the extent Smee argues that the RFC should have included these alleged limitations, she effectively rehashes her earlier challenge under SSR 16-3p. Because substantial evidence supports the ALJ's RFC determination, and because the ALJ was under no obligation to include bathroom breaks or absences in the RFC, Smee's argument fails.

**Conclusion**

For all the reasons stated, I recommend that the District Court affirm the Commissioner's decision.

Dated: August 14, 2026

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019).